932 So.2d 1206 (2006)
ATLANTIS AT PERDIDO ASSOCIATION, INC. and Spanish Key Condominium Owners' Association, Inc., Appellants,
v.
Bobby L. WARNER, Joseph W. and Helen M. Belanger, Donald Ray Stephens and State of Florida Department of Environmental Protection, Appellees.
No. 1D05-4069.
District Court of Appeal of Florida, First District.
July 6, 2006.
*1207 Jesse W. Rigby, Esquire and Jeremy C. Branning, Esquire of Clark, Partington, Hart, Larry, Bond & Stackhouse, Pensacola, for Appellants.
Sally Bussel Fox, Esquire of Emmanuel, Sheppard & Condon, P.A., Pensacola and Thomas G. Tomasello, Esquire of Thomas G. Tomasello, P.A., Tallahassee, for Appellees, Bobby L. Warner, Joseph W. and Helen M. Belanger and Donald Ray Stephens.
Mark S. Miller, Senior Assistant General Counsel and Teresa L. Mussetto, Senior Assistant General Counsel, Tallahassee, for Appellee, State of Florida Department of Environmental Protection.
BENTON, J.
Atlantis at Perdido Association, Inc. and Spanish Key Condominium Owners' Association, Inc. (the homeowners' associations) appeal a final Department of Environmental Protection (DEP) order approving the permit application Bobby L. Warner, Donald Ray Stephens and Joseph W. and Helen M. Belanger (the applicants) filed. The order directs issuance of Coastal Construction *1208 Control Line Permit ES-540 (the permit), and authorizes construction of a nine-story condominium complex on Perdido Key in Escambia County. The proposal was to locate the condominium complex 193 feet seaward of the coastal construction control line, and 45 feet seaward of a reasonably continuous and uniform line of buildings[1] (constructed on both sides of the proposed site, along a superseded control line), a line that is nearly 150 feet closer to the Gulf of Mexico than the current coastal construction control line. We reverse.
Without a DEP permit, "no person, firm, corporation, or governmental agency shall construct any structure whatsoever seaward" of a coastal construction control line.[2] § 161.053(2)(a), Fla. Stat. (2004). Coastal construction control lines are established by rulemaking, county by county,[3] only after comprehensive engineering *1209 studies involving models of 100-year return storms (and concomitant storm surges) take local tides and topographic surveys into account. Such studies allow DEP to predict the effect major storms will have on particular shorelines and indicate where the coastal construction control line should be placed to allow adequate regulation for the protection of upland properties and the control of beach and dune erosion. See generally St. Joe Paper Co. v. Fla. Dep't of Nat. Res., 536 So.2d 1119, 1120 (Fla. 1st DCA 1988). Rules establishing (or amended rules relocating) coastal construction control lines are published in the Florida Administrative Weekly and the Florida Administrative Code, and recorded in the public records of the county involved.
In the present case, the applicants proposed building the new condominium development, dubbed "BellaVista," seaward of the coastal construction control line on two adjacent parcels aggregating 1.19 acres with a total of approximately 100 feet fronting on the Gulf. Now occupying the site proposed for BellaVista are two one-story structures on piling, a duplex with floor dimensions of 44.1 feet by 31 feet (some 1,367 square feet not including decks or stairs) and, east of the duplex, a quadriplex with floor dimensions of 51.2 feet by 54.4 feet (some 2,785 square feet not including decks or stairs).
BellaVista was to consist of fifteen units, a swimming pool, a boardwalk originally planned as a dune walkover, and a driveway and parking area built with concrete pavers. The new building was to have been nine stories high  eight habitable floors above a parking level  and the structure was to have had a footprint of 70 feet in the shore normal direction and 80 feet in the direction parallel to the shore, some 5,600 square feet, abutting an additional 38.1 feet by 33.3 feet (some 1,268 square feet) of swimming pool and decking on the seaward side of the condominium tower.
The proposal was to demolish both the duplex and the quadriplex, and replace them with a condominium tower and swimming pool complex at a location slightly (18 feet) landward of the existing structures' location, albeit 45 feet seaward of the line of continuous construction and 193 feet seaward of the coastal construction control line. The appellant homeowners' associations' members are owners of condominiums in the Spanish Key and Atlantis complexes, structures adjacent to the applicants' site on either side, condominiums that are built landward of the line of continuous construction. The homeowners' associations participated as objectors in administrative proceedings on the permit application below.
While the application for a permit to construct the "BellaVista" condominiums was pending, Hurricane Ivan came ashore on Perdido Key, damaging the structures now on the proposed site and dramatically transforming the "beach dune system."[4] *1210 Less than a month after Ivan hit, DEP issued notice of its intent to grant a coastal construction control line permit authorizing the applicants to construct the new BellaVista complex, including the proposed parking garage, pool, deck, dune walkover, concrete driveway, and storm drainage facilities.[5]
DEP took the position that it had the authority to grant the permit pursuant to section 161.053(13)(a), Florida Statutes, asserting that the proposed project would constitute a "rebuilding" of the two one-story buildings currently on the property, which were damaged in the storm. The statute provides:
Notwithstanding the coastal construction control requirements defined in subsection (1) or the erosion projection determined pursuant to subsection (6), the department may, at its discretion, issue a permit for the repair or rebuilding within the confines of the original foundation of a major structure pursuant to the provisions of subsection (5). Alternatively, the department may also, at its discretion, issue a permit for a more landward relocation or rebuilding of a damaged or existing structure if such relocation or rebuilding would not cause further harm to the beach-dune system, and if, in the case of rebuilding, such rebuilding complies with the provisions of subsection (5), and otherwise complies with the provisions of this subsection.
§ 161.053(13)(a), Fla. Stat. (2004) (emphasis supplied). Below the issue became whether the BellaVista proposal contemplated "rebuilding" structures seaward of the coastal construction control line or whether the proposal called for new construction seaward of the coastal construction control line.
The parties and the administrative law judge proceeded on the agreed assumption that, while all projects (new construction and "rebuilding" alike) must comport with *1211 every other section 161.053(5) factor, "rebuilding" projects, unlike new construction, do not require DEP to take into account the "reasonably continuous and uniform construction line" factor set out in section 161.053(5)(b) and the administrative rule which implements the statute.[6] The "reasonably continuous and uniform construction line" the administrative law judge found in the present case lay along what had been the 1975 coastal construction setback line. At hearing, Orlando Gomez, an engineer in the employ of DEP's Bureau of Beaches and Coastal Systems who helped evaluate the BellaVista project permit application, testified that, "for a project proposed on the land or the vacant land," as opposed to a project proposed on property with an "existing structure on it," it "would be true" "that projects in this area of Perdido Key are not allowed to extend further than the 1975 Control Line, typically."
Tony McNeal, administrator of DEP's coastal construction control line program and an expert in coastal engineering, testified, however, that the BellaVista project would constitute "rebuilding" of the two structures now on site. Mr. McNeal said that, in DEP's view, "rebuilding" can include replacement construction in a location more landward than the original building site, even where the replacement construction's scale, dimensions and configuration differ dramatically *1212 from the razed original's. Accepting DEP's view, the administrative law judge endorsed the legal conclusion that the proposed BellaVista project was a "more landward relocation or rebuilding of [] damaged or existing structure[s]." § 161.053(13)(a), Fla. Stat. (2004). In the final order under review, DEP adopted the recommended order in its entirety.
But section 161.053(13)(a) applies only to "the repair or rebuilding within the confines of the original foundation of a major structure" or, "[a]lternatively, . . . [the] landward relocation or rebuilding of a damaged or existing structure." § 161.053(13)(a), Fla. Stat. (2004). The new nine-story condominium development the applicants propose is not a "repair or rebuilding within the confines of the original foundation." The application does not propose "relocation" of the duplex and quadriplex now on site. In the words of a DER administrator, "[t]he existing structures will be leveled and new structures built in their place." Plainly the applicants do not propose to relocate the existing structures. Nor does the permit authorize merely "rebuilding" the existing structures in a landward location. The permit authorizes something new and very different.
DEP has misconstrued the word "rebuilding."[7] DEP's own official definition of "rebuilding" bears this out. Florida Administrative Code Rule 62B-33.002(47) defines rebuilding as "a substantial improvement of the existing structure as defined in Section 161.54, F.S." Fla. Admin. Code R. 62B-33.002(47) (2005) (emphasis supplied). See Vantage Healthcare Corp. v. Agency for Health Care Admin., 687 So.2d 306, 308 (Fla. 1st DCA 1997) ("The agency is obligated to follow its own rules."). Similarly, "substantial improvement" in section 161.54, Florida Statutes, is defined as the
repair, reconstruction, rehabilitation, or improvement of a structure when the actual cost of the improvement or repair of the structure to its pre-damage condition equals or exceeds 50 percent of the market value of the structure either:
(a) Before the improvement or repair is started; or
(b) If the structure has been damaged and is being restored, before the damage occurred.
§ 161.54(12), Fla. Stat. (2004) (emphasis supplied). On the facts of this case, the term "rebuilding," as used in section 161.053(13)(a), "is clear and unambiguous, [and] we need not consider the Department's interpretation or the statute's legislative history." State, Dep't of Rev. v. Lockheed Martin Corp., 905 So.2d 1017, 1022 (Fla. 1st DCA 2005). "[W]here a department's construction of a statute is inconsistent with clear statutory [and rule] language it must be rejected, notwithstanding how laudable the goals of that department [may be]." Fla. Dep't of Child. & Fam. Servs. v. McKim, 869 So.2d 760, 762 (Fla. 1st DCA 2004).
"`[T]his court is without power to construe an unambiguous statute in a way which would extend, modify, or limit its express terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power.' Am. Bankers Life Assurance Co. of Fla. v. Williams, 212 So.2d 777, 778 (Fla. 1st DCA 1968)." Beshore v. Dep't of Fin. Servs., 928 So.2d 411, 413 (Fla. 1st DCA 2006). "`It is a settled rule of statutory construction that unambiguous language is not subject to judicial construction, however wise it may seem to alter the plain language. . . . We trust that if the legislature *1213 did not intend the result mandated by the statute's plain language, the legislature itself will amend the statute at the next opportunity.'" McKim, 869 So.2d at 762 (quoting State v. Jett, 626 So.2d 691, 692 (Fla.1993)).
To rebuild is "[t]o build again," "[t]o make extensive structural repairs on," or "[t]o remodel or make extensive changes in." The American Heritage College Dictionary 1139 (3d ed.1993). Accepting the premise that rebuilding can mean to "remodel or make extensive changes in," DEP argues:
The pertinent definition of "rebuilding" used by the Department contemplates that a more landward structure which otherwise complies with the provisions of [the statute] may be "extensively changed," so long as the net impact to the Act's enumerated environmental concerns is not increased. Viewed in context, this [statutory] construction is a permissible one.
DEP's expertise requires us to consider its construction of the statute carefully, but "nothing requires that we defer to an implausible and unreasonable statutory interpretation adopted by an administrative agency." Sullivan v. Fla. Dep't of Envtl. Prot., 890 So.2d 417, 420 (Fla. 1st DCA 2004) (internal quotation marks omitted).
The Legislature is presumed to have chosen the word "rebuild," as opposed to another word, e.g., "redevelop," for a reason.[8] "[T]he Legislature is assumed to know the meaning of the words used in the statute and to have expressed its intent through the use of the words." Lockheed Martin Corp., 905 So.2d at 1020. "One of the first rules of statutory construction is that the plain meaning of the statute is controlling." Beshore, 928 So.2d at 412. The word "remodeling" and the phrase "to make extensive changes in" do not contemplate the obliteration of every element of two smallish one-story buildings and their replacement with a totally new, altogether different, nine-story edifice, complete with appurtenant structures.
As a fallback, the applicants argue for affirmance on the ground that DEP concluded that the proposed project passed muster under the substantive section 161.053(5) and (6) criteria, on balance, albeit without considering the line of continuous construction criterion. On this record, however, it is difficult to avoid the conclusion that DEP would have denied the BellaVista application if DEP had evaluated it as  according to the DEP evaluators themselves  the law requires that applications for new construction be evaluated.[9]
While DEP and the administrative law judge did consider other criteria, including engineering data concerning shoreline stability, storm tides, design features of the proposed structures, potential impacts from the location of such structures, sea *1214 turtle inactivity, potential interference with public beach access, and thirty-year erosion projections, they explicitly omitted[10] any consideration of the reasonably continuous and uniform line of construction in the vicinity. This omission was fatal, and belies the assertion that the applicants have demonstrated entitlement to the coastal construction permit they seek. DEP's failure to take the "reasonably continuous and uniform line of construction" into account fell outside the range of discretion delegated to DEP by law and was inconsistent with its own rule. See § 120.68(7)(e), Fla. Stat. (2004). See also § 161.053(5)(b), Fla. Stat. (2004); Fla. Admin. Code R. 62B-33.005(9) (2005). The order under review directs issuance of a permit that authorizes new construction, not "rebuilding."
Reversed.
POLSTON and THOMAS, JJ., concur.
NOTES
[1] The proposed site lies on the northern shore of the Gulf of Mexico approximately 500 feet east of the Alabama state line. As to the location of other buildings on the Florida side of the state boundary, the administrative law judge accepted the homeowners' associations' contention

that there is a reasonably continuous and uniform construction line seaward of the current (the 1986) CCCL [coastal construction control line] "in the immediate contiguous or adjacent area" and landward of the proposed Project  namely, along the line of the former (the 1975) CCCL. In fact, such a line of construction exists extending approximately 500 feet west, and approximately 1,500 feet east, of the proposed Project. . . .
See generally Regency Towers Condo., Owners Ass'n, Inc. v. Destin Architectural Group, Inc., Fla. Admin. Recommended Order No. 94-5826 (Dec. 22, 1994) (on file with clerk, Fla. Div. of Admin. Hearings) (available at 1994 Fla. Div. Adm. Hear. LEXIS 5971, *13) ("To establish the line of construction, DEP typically looks at the seaward location of structures 1,000 feet on each side of the proposed structure to be permitted."). See also § 161.053(5)(b), Fla. Stat. (2004).
[2] The coastal construction control line applies to all new construction. The Legislature specifically exempted from the section 161.053 requirements "structures existing or under construction prior to the establishment of the coastal construction control line." § 161.053(9), Fla. Stat. (2004).

A DEP permit is also required to "make any excavation, remove any beach material, or otherwise alter existing ground elevations; drive any vehicle on, over, or across any sand dune; or damage or cause to be damaged such sand dune or vegetation growing thereon seaward" of a coastal construction control line. § 161.053(2)(a), Fla. Stat. (2004).
[3] Section 161.053(1)(a) makes explicit the legislative intent that permits be required for construction seaward of an established coastal construction control line:

[I]t is the intent of the Legislature to provide that the department establish coastal construction control lines on a county basis along the sand beaches of the state fronting on the Atlantic Ocean, the Gulf of Mexico, or the Straits of Florida. Such lines shall be established so as to define that portion of the beach-dune system which is subject to severe fluctuations based on a 100-year storm surge, storm waves, or other predictable weather conditions. . . . Special siting and design considerations shall be necessary seaward of established coastal construction control lines to ensure the protection of the beach-dune system, proposed or existing structures, and adjacent properties and the preservation of public beach access.
§ 161.053(1)(a), Fla. Stat. (2004). The Florida Legislature enacted section 161.052, Florida Statutes, in 1970 to prohibit certain construction activities "within 50 feet of the line of mean high water at any riparian coastal location fronting the Gulf of Mexico or Atlantic coast shoreline of the state, exclusive of bays, inlets, rivers, bayous, creeks, passes, and the like." St. Joe Paper Co. v. Fla. Dep't of Nat. Res., 536 So.2d 1119, 1120 (Fla. 1st DCA 1988) (internal quotations omitted). In 1971, the Legislature enacted section 161.053, which directed the Department of Natural Resources to establish coastal construction setback lines "on a county basis along the sand beaches of the state fronting on the Atlantic Ocean and the Gulf of Mexico for the purpose of protecting [Florida's] beaches and adjacent coastal area dunes from imprudent construction." Id. In 1978, the nomenclature was changed to coastal construction control line. Id. (citing ch. 78-257, Laws of Florida).
[4] In this connection, the administrative law judge made, and DEP adopted, the following findings of fact:

13. Ivan was a major magnitude storm with a storm surge of 15-20 feet, which exceeded the predicted storm surge of a 100-year storm in Escambia County. The existing dwellings on the Property survived the storm but were severely damaged. Ivan destroyed all of the vegetation that existed on the Property and on the beach dune system to the east and west. Ivan also destroyed all of the dunes on the Property and on the beaches to the east and west of the Property.
14. Towards the end of March 2005, Escambia County placed a sand berm on the beach in front of the existing structures on the Property and along the beach to the east and west of the Property. The placement of the sand was partially funded by the Federal Emergency Management Agency (FEMA) and is meant to provide some immediate protection for upland structures, especially those that have been damaged or are vulnerable to damage, from higher-frequency storms. Initially, it would provide less protection from lower-frequency storms and, obviously, would be destroyed by a storm like Ivan. However, depending on future storm events, it would provide some protection and could contribute to recovery of the beach and dune system over time.
. . . .
18. . . . . The FEMA dune is now the only dune on the Property or adjacent properties.
. . . .
22. Along with accretion, the dune system in the area of the Property also was growing prior to Ivan, and dune recovery seaward of the new FEMA dune is expected. The primary dunes that existed pre-Ivan on the adjacent properties immediately seaward of the Spanish Key and Atlantis condominiums, which included dunes with elevations of 16-17 feet, will take 25-50 years to rebuild through natural processes, such as aeolian (wind-driven) transport. Some may never recover to previous elevations. The lower dunes, such as those that existed on the Property, may recover in ten years. Since the Project is located landward of the FEMA dune, it will not interfere with post-storm recovery of the dune system.
[5] DEP's notice of intent took the form of a "Final Order" approving the applicants' application for a permit to construct BellaVista. After receiving written notice of DEP's proposed action, the homeowners' associations filed a petition for formal hearing under section 120.57(1), Florida Statutes, challenging DEP's intent to issue the permit. In response, DEP referred the matter to the Division of Administrative Hearings, where it was assigned to an administrative law judge.
[6] The shared assumption is that where, as here, the subject property has structures seaward of the surrounding line of construction, it cannot be said that the line of construction is continuous because structures on the subject property interrupt it:

[I]n making their "line of construction" argument, Petitioners ignore the existing structures on the proposed Project site.
. . . .
[I]n this case, under the "landward rebuilding or relocation" provisions, the existing structures on the BellaVista site cannot be disregarded.
The ALJ concluded in his recommended order  a determination not disputed in this appeal  that "[t]he line of construction is a factor for new construction but not for rebuilding or relocation of a building landward." Section 161.053(5)(b) provides:
(b) If in the immediate contiguous or adjacent area a number of existing structures have established a reasonably continuous and uniform construction line closer to the line of mean high water than the foregoing, and if the existing structures have not been unduly affected by erosion, a proposed structure may, at the discretion of the department, be permitted along such line on written authorization from the department if such structure is also approved by the department. . . .
§ 161.053(5)(b), Fla. Stat. (2004). Rule 62B-33.005(9) of the Florida Administrative Code provides:
If in the immediate area a number of existing major structures have established a reasonably continuous and uniform construction line and if the existing structures have not been unduly affected by erosion, except where not allowed by the requirements of Section 161.053(6), F.S., and this rule chapter, the Department shall issue a permit for the construction of a similar structure up to that line, unless such construction would be inconsistent with subsections 62B-33.005(3), (4), (7), (8), or (10), F.A.C.
Fla. Admin. Code R. 62B-33.005(9) (2005). Neither the statute nor the rule addresses construction seaward of a reasonably continuous and uniform line of construction explicitly, but appellants argue that they discourage such construction by negative implication, even if they do not forbid it. See generally Regency Towers Condo., Owners Ass'n, Inc. v. Destin Architectural Group, Inc., Fla. Admin. Recommended Order No. 94-5826 (Dec. 22, 1994) (on file with clerk, Fla. Div. of Admin. Hearings) (available at 1994 Fla. Div. Adm. Hear. LEXIS 5971, *14) ("The Pelican Beach Resort project complies with DEP's setback requirements and its line of construction requirements."); see also Kelly Cadillac, Inc. v. Fla. Dep't of Envtl. Prot., 20 F.A.L.R. 1343, 1360 (Fla. Dep't of Envtl. Prot.1998) (available at 1998 Fla. ENV LEXIS 43, *42) ("[T]he line of construction is not a prohibition in and of itself. . . .").
[7] Section 161.053(13)(a) is concerned with "rebuilding" in two situations: rebuilding within the confines of the original foundation of a major structure  concededly not applicable here  or rebuilding a damaged or existing structure on another site farther landward.
[8] Tony McNeal testified below not only that "[t]he existing structures will be leveled and new structures built in their place," but also that "[t]he proposed project is a redevelopment consisting of the replacement of two single family dwellings with a[n] eight story multi-family dwelling and other amenities."
[9] DEP's own permitting official testified in response to counsel's questions at hearing:

Q As a coastal engineer, you would be okay with seeing the other structures that are along that section of the beach [such as the adjacent Atlantis condominium] come forward as far seaward as the proposed BellaVista project?
A No, sir.
Q Why not?
A Again, the BellaVista project has existing buildings at a certain position already which are expected to cause certain impacts. The charge here is to try to improve upon those conditions. A new structure placed seaward at that location would be expected to cause impacts, also, that would be unacceptable.
Q So if Atlantis wanted to come in and go more seaward, that would not be acceptable to the Department?
A That's correct.
. . . .
Q So then there's a difference between [a] proposed project that's rebuilding as opposed to new construction?
A That's correct.
Q And for new construction then the determination would have to be made by the Department?
A Yes. A Line of Construction is definitely a factor in the new construction. . . .
[10] Without contradiction, Mr. McNeal testified:

Q Has a reasonably continuous and uniform Line of Construction been established for the proposed project at issue here?
A No.
Q [W]as a reasonably continuous and uniform line of construction determination necessary for the proposed project?
A No.
As to the reasoning behind this omission, he testified:
A[S]ection 161.053 of the Florida Statute[s] is the governing Statute for Coastal Construction Control Line Permitting. Within that section it talks about what should be considered in granting a permit. And Line of Construction is one of those factors. But, also, within there is subsection 13 that's been cited already on record. When looking at the construction, we have to determine is it new construction or is it rebuilding. Because if it's new construction, then it does not fall within subsection [13]. . . . So, in the Line of Construction determination, subsection 13, if it's just a rebuilding, there [is] no charge that we have to meet in Line of Construction. The criteria is different than it is for new construction. Therefore, we do not necessarily look at Line of Construction in that instance. . . .